Okay, the next argued case is number 14-17-18, R. Plus L. Carriers, Incorporated, against Qualcomm. Mr. White. Thank you, Your Honor. Good morning, Your Honors. Counsel, and may it please the Court. This case presents an important opportunity for this Court to reaffirm that a patentee can, in fact, define a characteristic or claim term by invocation. The intrinsic evidence of the 07-8 patent shows that on the question of how a loading manifest is generated, there is only one answer. A loading manifest is only generated using load planning software. Throughout the specification, the patentee repeatedly used the terms loading manifest and advanced loading manifest interchangeably as synonyms. That shows that the patentee intended that for purposes of the 07-8 patent, an advanced loading manifest and a loading manifest are the same thing. The patentee expressly defined an advanced loading manifest as something that is generated using load planning software. Why was the word advanced added, if not to overcome priority? Your Honor, the record reveals that the examiners during the reexamination requested that for clarity purposes, the word advanced be inserted into claim one, amended claim one, because that the term advanced loading manifest was used repeatedly throughout the patent. There's no express statement beyond what I've just said as to any particular purpose beyond that. I would say this, that a reasonable inference from that evidence in the record is that the examiners viewed advanced loading manifest and loading manifest to be interchangeable synonymous terms. Certainly, I think, Your Honor, what we can also take from the record is that it was not intended to overcome any prior art, given the fact that the two amendments previous to this particular amendment, in fact, this amendment was not proposed by R&L carriers during the reexamination process to overcome any of the prior art. The amendments that R&L had proposed to adjust with respect to the prior art were considered by the examiners and tentatively agreed upon with Patent Council, that that would satisfy all of the elements of the rejection that had come out of the PTL. It was only after that that the PTO examiner said, well, let's put this in there as well for clarity purposes. Well, let's assume that we find that what the PTO examiner really wanted in the reexam was to differentiate, to have, force you to differentiate between a loading manifest that's on the original truck and a loading manifest that's on a future shipment, and that their preference for the word advanced was for the same reason as their preference for the phrase about a future shipment. Even if that's the case, if putting advanced in could otherwise limit the claim in other ways, does it matter why the PTO wanted the word put in? I think that, Your Honor, in the end, why the PTO wanted the amendment in there is important background information. It's better for the other side if the PTO wanted it in there for purposes of the precise debate we're having here. But even if that's not why the PTO wanted it in there, don't we still have to look to see if in fact the claims were narrowed? I agree with you, Your Honor. I think that while that is evidence of whether or not the claims were actually narrowed by why the examiners asked for this particular amendment to be put in, that does not, whether they had a neutral mindset or a mindset that this was for a substantive purpose, is not answering the question. The question is, as Your Honor has said, were the claims in fact narrowed? Okay. So let's put aside why it might have been amended. Sure. It's true that it was amended. Correct. So why wasn't the word advanced in Claim 1 in the first instance? Your Honor, I wish, the record does not reveal why exactly Loading Manifest was used in Original Claim 1 as opposed to Advanced Loading Manifest. The record only reveals what I believe to be the patentee's clear intent. And that is that those two terms mean the same thing, that they're interchangeably used throughout the patent. I mean, the one, we could ask, if we had the patentee here, we could ask the patentee, well, why did you refer in Figure 6 to a Generate Loading Manifest 740 and then in the written description say the exact same thing at 740 called an Advanced Loading Manifest? I think that we can take from that that the patentee was telling us and telling the world that these two terms are used interchangeably, that they are the same thing for purposes of the 07-8 patent. And why it wasn't used in Original Claim 1 with Loading Manifest versus Advanced Loading Manifest, if I had to guess, and there's no answer to that question in the record, if I had to guess, I would guess that the patentee did not consider that to be an important distinction at the time because those two terms mean the same thing to a person of ordinary skill in the art. Looking at the written description, though, what's your answer to all those references to the manual extraction of data? I don't dispute that the patent seems to be focusing on a complete computerized system, but then why talk about the manual extraction of data or that being an option? Because, Your Honor, there's an important distinction in the process that's discussed here in this patent between extraction and the generation of Loading Manifest. You're absolutely correct that the patent over and over again talks about different various ways to extract load planning information from the documentation data. And the patent recognizes there are several ways to do that. One way is to do it automatically where you take the data that's been transformed into the load planning software. Another way to do it, and this varies depending on what truck or company you might be dealing with out there, is to take the information from the bill of lading and actually manually key it into the load planning software. The fact of manual keying, the fact of manually extracting information, does not mean that the information you are extracting must be used by generation by hand in the absence of load planning software. It's just a recognition that the first step of this is to get the load planning information out of the documentation data. The second step is generate a Loading Manifest. And I would respectfully submit to the court that just merely manually pulling information out of documentation data does not require or even suggest that you're generating a Loading Manifest on the back end without the use of load planning software. But don't you actually come right out and say that the system can go so far as to just have use of paper for purposes of preparing a Loading Manifest? Yes, Your Honor. That statement does appear in the patent and specification. And that statement is referring again to the extraction process. Because the extraction process, in fact the quote is, in practice this system can range from a fully automatic electronic paperless system to one which relies on paper and uses the system merely as a transmission device. That quote is entirely in the context of extraction. If we look at the written description in the specification where that quote appears, there is no discussion whatsoever about how a Loading Manifest is generated. That quote is entirely in the context of how information is extracted from the documentation data, load planning information. And by the way, the load planning extraction system does in fact range from a fully automated one to one that merely transmits the bill of lading to a load planner for manual entry into the load planning software. So if we view that quote in the context of extraction, which is the only context in which it appears, and we say, okay, does that make sense in the context of extraction? The answer is yes, it does. And so I would respectfully submit that a sentence in the context of extraction that makes sense in that context does not tell us that the second part of this process does not require load planning software. But why is it that in the Pitt, Ohio case and even in this case that you didn't argue for the limitation of computerized preparation of the Loading Manifest? Your Honor, when we looked at the question of what is a Loading Manifest and submitted that for purposes of claim construction to the trial court, we felt that there was a difference between what a Loading Manifest is and how it is generated. It is clear we believe in the record how a Loading Manifest is generated. The Advanced Loading Manifest, its synonym, is clearly defined as a document generated by load planning software discussed above, discussed in the written description. That doesn't tell us what a Loading Manifest is, what an Advanced Loading Manifest is, but it clearly tells us how an Advanced Loading Manifest is generated. So when we see synonymous use of Advanced Loading Manifest and Loading Manifest and a clear description of how that thing is generated, we did not feel, we did not submit to the trial court the question of how an Advanced Loading Manifest is generated as being ambiguous. Neither did Qualcomm, the defendant in this case, suggest to the trial court in any respect that how an Advanced Loading Manifest is generated was ambiguous in any respect in required construction. We submitted to the trial court what we felt was the best use of the trial court's time. Construe what a Loading Manifest is. Tell us what that is. And that's the only thing the trial court considered. We did not object to the Pitt, Ohio reference to load planning software. But I will say this, Your Honor. I think it is important evidence for this court as to whether or not this term has been defined by implication that a competitor of R&L Carriers, a company that is looking to understand and interpret this patented process, recognized explicitly the implication that we're arguing for here. That a load planning software is used to generate a Loading Manifest just like an Advanced Loading Manifest. Meaning Pitt, Ohio saw what we're arguing here. And that is that these two terms are synonymous. Okay. Thank you. Thank you. Let's hear from the other side. Mr. Van Udenberg. Mr. Van Udenberg. Good morning, Your Honors. May it please the court. The claims of the 078 patent were amended during reexamination in order to overcome multiple prior art rejections. If you look at the remarks that accompanied their amendment, they repeated... Mr. Van Udenberg, on page 6 of your responsive brief, you say the PTO granted the reexamination, rejected the claims, and then to overcome the rejection, R&L amended claim 1. And you cite some pages in the record. In one of those pages, R&L says, although the present communication may include alteration of the claims or characterizations of claims, scope, or reference art, patent owner is not conceding in this application that previously granted claims are not patentable over the cited references. Rather, any alterations or characterizations are being made solely to clarify the previously granted claims. What evidence do you have that they amended specifically to overcome prior art? A couple things, Your Honor. First of all, that comes at the end of a roughly 25-page amendment. And you need to look at that amendment as a whole because what you'll see... But you cited me to that page. But there's a number of pages that come before that. And what you will see in the 20 pages before that is repeatedly the patentee emphasizing that it was the claims as amended that were patentable over the prior art. And literally 12 different times, they bolded the amended phrase and said, that's why these claims are patentable over the prior art. Then on the very last page, they have essentially a boilerplate paragraph that says, oh no, by the way, this may not actually change the claim. They didn't clearly say it doesn't change the claim. They used the word clarity or to further prosecution, which can mean narrowing the claim. But are you telling us that that was a concession that the prior claims were unpatentable? These procedures are for safeguards and clarity. They don't say that what we had before was wrong. It certainly is possible that claims can be amended during prosecution and their scope does not change. This court previously called it difficult to conceive many circumstances where that would occur. But it certainly can occur. But that is not what occurred in this case. And I want to turn to just the regular claim interpretation analysis. But one last point I want to make on the prosecution history is two points. One is, how did the examiners view this? Well, that's actually important because examiners tell us how they viewed it, that they viewed both of those amendments as relating to whether or not it was for the current shipping vehicle or a future shipping vehicle. I don't believe so, Your Honor. If you look at A3198, this is the patent office's interview summary instead of RNL's interview summary, which frankly is a bit self-serving. There are key distinctions between those two interview summary documents. And you can see, for example, RNL says agreement was reached and everything. The patent office said no, no agreement was reached. But if you look at the PTO summary, what you see is, and again, I'm on A3198. There's a paragraph talking about N&M. Perhaps I'll let Your Honor get to that page. OK, which paragraph? So I'm on the probably fourth paragraph. It starts out, Mr. Oberhaus pointed out the paragraph four. So that paragraph talks about N&M. And that paragraph does essentially acknowledge that N&M was overcome with the amendment about it being for another vehicle. But then if you get to the next paragraph, it says, Mr. Oberhaus further explained that the Rosenbaum prior art discussed generating resolved address data bought before the physical mail pieces arrived at the receiving station. Here's the key sentence. It does not generate an advanced loading manifest document as required by the proposed amendment, which will be used for another transport vehicle. So if they were only talking about the other transport vehicle, that little clause there as required by the proposed claim amendment would have been at the end of the sentence. The examiners believed that the advanced loading manifest document language was critical to allowance. You see that not only on this document. Again, not because it was computerized. I mean, if you look at 3088, they talk about N&M and Rosenbaum, Highwaymaster, Quiet. They talk about all of them in combination. It says whether taken alone or in combination, they failed to teach prior to the package being removed from the transport vehicle information being sent to prepare a loading manifest for a new vehicle. So the whole advance had to do with preparing it for the new vehicle. That was certainly the focus of their argument. But each and every time, they would take this whole long phrase as being the reasons for allowance. Again, when you turn to the actual reasons for allowance that the examiner gave, the examiner bolded and underlined the entire phrase, not just before another document. So say we disagree with you on your interpretation of the re-exam. It really then turns back to exactly what Your Honor said. At the end of the day, it doesn't matter why it was amended. What matters is did the scope of the claims change during re-examination. So if you look at the patent, I mean, the abstract, I know it's not supposed to mean a lot, but it is indicative. I mean, the abstract itself makes it clear that the only thing that they're really talking about being the novel invention here has to do with computerized generation of a loading manifest. Of course, let's first start with a little bit of history here, Your Honor. Back in the time this application was filed, we still had 37 CFR, I think it's 1.71, that said we don't use the abstract for construing claims. I understand that, but that doesn't mean that you ignore it. But even that's still not a statement of this is the only thing the invention does. If you don't have load planning software, you're not practicing our invention. That's really what we're talking about here is disavowal. Does the specification teach us that unless we have load planning software, you're not practicing my invention? And the best place to look for that, outside the claims, of course, is the summary of the invention. The summary of the invention says exactly the opposite. The first sentence just says broadly what you get from reading this patent as a whole, which is that the invention is about this part of having the truck drivers wirelessly transmit in the bill of lading. The background acknowledges that load planning software is known, so the alleged invention is about getting the information into the computer system earlier. But then the summary of the invention says we then send that load planning data to a load planner or to load planning software. And that's where the district court correctly recognized that's a clear statement that load planning software is merely optional. How do you respond to your friend's argument that to the extent you send it to a load planner or to any manual use, that it's only for purposes of extracting the data, but then you still have to input it into the computer to generate the advanced loading manual? My answer is that's simply not what the specification states, and certainly both parties have spent a lot of time talking about those paragraphs in column 5 and column 6 of the specification where it talks about extracting the data. And I simply urge your honors to read that yourselves, because I think you will agree with the district court and with us that R&L's counsel is not correctly representing what it says. Because when it talks about it, it says you can do this both ways. You can extract the data either via OCR or manually. But then it goes on to say what you do in both instances. And each time it says, well, you can do one of two things. You can send it to a load planner or to load planning software. The first one, the one that relates to OCR, is the one that right bridges columns 5 and column 6, and the critical language is right at the top of column 6, starts at line 2. It says, as an additional time saver, the load planning information could be sent to a computer, and then the next sentence says this computer would run load planning software. So it's saying could, not must, could. And that's only as an additional time saver. Then it goes on to talk about the manual option. And let me make a distinction because counsel still tries to mix these two things up in your mind. He says, oh, but then it says the load planner would extract the information. It doesn't say that. It says a data entry clerk would extract the information. And then the data entry clerk who extracts the information types it in. It says it can go to load planning software. But again, another very critical sentence. It says, this is at column 6, line 11, if a computerized load planning system was not utilized, a paper copy of the electronic bill of lading would be printed and given to the load planner. Again, you could not be clearer and express recognition in this specification that load planning software is not necessary. And then a couple of lines later, you have the sentence that you discussed about this could be a fully automatic system or simply a system for transmitting paper. Again, counsel says that that relates only to the extraction process. What about right after that sentence that you quote at the beginning of the next paragraph that the billing information extracted would be transmitted or inputted into a standard billing and accounting software package, which could automatically invoice the shipper so that we know there would be a shorter time period. Doesn't that imply, again, that we're talking about extraction? Well, there's two things going on here. There's extracting billing information and extracting load planning information. Certainly, it is still talking about the overall process of extracting information and then what you do with it. But there's no basis to conclude that later in that paragraph when it says fully automatic system versus just transmitting paper around, that that's limited to the extraction procedure. So again, and let's put it this way, at the end of the day for disavowal, this court's case law says it has to be clear and unambiguous in order for the disavowal to apply. The patentees are the ones in this case who are seeking to construe the original claim term, loading manifest, contrary to its ordinary meaning. We all know that the ordinary meaning of a loading manifest is not a loading manifest that's generated only in a particular way, and there's nothing in the claim language that tells us how that loading manifest needs to be generated. So we're talking about disavowal. It has to be clear and unambiguous. This is not it. It's exactly the opposite. It's telling us pretty clearly that you cannot, you don't need to use load planning software under this invention. I also want to address the argument that, well, the express definition that applies to advanced loading manifest also applies to loading manifest because the specification uses those two terms synonymously. Your Honors, it does not use the two terms synonymously. It uses them exactly how you would expect us to use them, which is in a description of ever-narrowing terminology. An advanced loading manifest is a type of loading manifest. A loading manifest is a type of a manifest. It's how we ordinarily use the English language. When you read the few instances of loading manifest in the specification, there's actually only two of them,  you see in both instances they're using it exactly in that sense of loading manifest being broader than advanced loading manifest. And I see my time's running a little short, but let me talk about the one in particular in Column 13 because it makes perfect sense. The specification is talking about a remote facility requesting data from a remote process, and it says, well, a remote facility can request a loading manifest from the remote processor. And in response to that request, the remote processor extracts load planning data, generates an advanced loading manifest, and returns it. And, of course, R&L says, aha, that shows that they're using those two terms synonymously. They're not at all, Your Honor. It's exactly what you would expect. This facility doesn't care how their loading manifest is generated. They just want a loading manifest. So you wouldn't say advanced loading manifest there. You would say they request a loading manifest. Well, look at Column 12 where they refer to Figure 6, and Figure 740 and Figure 6 is described as an advanced loading manifest. So you're saying that's not, they're not comparing or equating the two? In Figure 6, the only thing they have is the written text of the specification says at this step it generates an advanced loading manifest, and when you look to the box in Figure 6, all it says is generate loading manifest. But, again, that is consistent with the idea that an advanced loading manifest is a type of loading manifest. So there's nothing incorrect about the figures, even when these two terms have different scopes. Again, there's limited room to put terminology in patent drawings, so it's also kind of expected that you wouldn't see too many words in a patent drawing. But the mere omission of that word from the drawings doesn't show that they're synonymous. It's consistent with one being broader than the other. The last point I want to touch on before my time runs out is this point of the two prior claim interpretation procedures that took place in the district court. The Pitt, Ohio one could not be clearer. Pitt, Ohio expressly put the limitation in the proposed construction of loading manifest that the patentee now wants to be read into the claims, and they fought it. They responded with a very carefully crafted construction of their own that differed really in two ways, and we have the two constructions in our brief, but they tried to track language as much as they could. There's two striking differences. One is this very issue of generated using load planning software. Is there anything in the Pitt, Ohio hearing or briefing that would rise the level of the judicial estoppel where they said absolutely this limitation is not necessary? There's no estoppel here, Your Honor. Really what it goes to show is that this is an after-the-fact generation of a proposed construction by R&L that if it was really the case, they would have said it earlier. It was only when they realized they had an intervening rights problem, they amended their claim right into an express definition of the specification, they said, oh, well, wait a minute, we've got a problem here. Let's go back and try to redefine what this original claim term meant. What the original claim construction show is that that was just a mere afterthought.  Thank you, Your Honor. Thank you, Mr. Vandenberg. Mr. White. Thank you, Your Honor. Let me address the Pitt, Ohio specifically. In the Pitt, Ohio claim construction process, R&L argued to the trial court implicitly, and one could call it explicitly, that advanced loading manifest and loading manifest were, in fact, synonymous. When we opposed the Pitt, Ohio definition of loading manifest, because of the limitations at Pitt, Ohio, we believed improper limitations Pitt, Ohio placed on that term. We cited the trial court to the 25 definitions of advanced loading manifest. To inform the court as to what exactly the definition of what a loading manifest is. So in the Pitt, Ohio case, we did not object to load planning software as a concept for how it is generated. We objected to the fact that it didn't need to be placed in the question of what is a loading manifest in the course of this particular proceeding. Now, with respect to the two, let me point out one other thing. Qualcomm was amongst a group of defendants at the time involved in a multi-district litigation. One of their own, in the claim construction process, took the position that a loading manifest is something that is generated by using load planning software, exactly like an advanced loading manifest. If Qualcomm truly believed that that is incorrect, that that's not a correct interpretation of how you generate a loading manifest, and they're not synonymous in that respect, we should have heard in front of the district court, in the claim construction process in which Qualcomm participated, to say, hey look, people out there might interpret a loading manifest to be generated by load planning software. We don't think that's the case. Judge, it's ambiguous, construe how a loading manifest is generated. Qualcomm didn't make that statement. They sat quietly. They knew one of their own had taken that exact position. They did not then suggest to the district court that that needed to be part of the construction. Why? Well, we can infer from that silence that Qualcomm agreed with Pitt, Ohio at the time, that a loading manifest is one generated with load planning software, and only now are they attempting to reverse that particular position because it serves ultimately their best interests. Now, with respect to the particular quotes in the written description that counsel referred to, I would only ask the court to respectfully look back at the written description, and you will see that they are all referring to extraction. None of those quotes refer at all to the generation of a loading manifest process. That's the part of the process that's the key here. I submit to the court respectfully that we cannot answer how a loading manifest is generated by looking at the extraction part of this particular patented process. We must look for the loading manifest part, and in that instance, there is only one description, and that description is that a loading manifest, like an advanced loading manifest, is generated using load planning software. And as I conclude, Your Honor, I want to conclude with maybe the most important point. The ability of a patentee to define a characteristic of a claim term by implication is an important tool, and one that I respectfully suggest should be protected by this court. That principle makes this an important case. I believe that this court will be hard-pressed to find a stronger example of a patentee defining a claim term by implication than the case we have here. Here, a patentee expressly defined how a thing, an advanced loading manifest, is generated. The patentee then used a claim term, loading manifest, interchangeably with that expressly defined thing. The patentee went on to repeatedly and consistently describe the term loading manifest in the specification as necessarily being generated by load planning software. And we have unrefuted evidence in the record that the public is on notice and understands this implicitly defined characteristic of a loading manifest in the 078 patent. Could Ohio, a competitor of R&L, recognize that a loading manifest is generated using load planning software? Each and every aspect of definition by implication is met here. I respectfully submit to the court that if this court's precedent that a patentee can define a characteristic of a claim term by implication is to have meaning going forward, this court should find for R&L carriers. Thank you for your time. Thank you, Mr. Wyatt. Mr. Daniel Good, the case is taken into submission. That concludes this morning's schedule.